555 F.2d 1125
 ITT WORLD COMMUNICATIONS, INC., RCA Global Communications,
Inc., and Western Union International Inc., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
American Telephone and Telegraph Co., Xerox Corp., Hawaiian
Telephone Co., and American Petroleum Institute,
Intervenors.
 Nos. 195, 1008, 1009, Dockets 76-4049, 76-4061, 76-4074.
 United States Court of Appeals,
Second Circuit.
 Argued March 4, 1977.
Decided June 3, 1977.
 
 Charles P. Sifton, New York City (John S. Kinzey, LeBoeuf, Lamb, Leiby & MacRae, Howard A. White, John A. Ligon, ITT World Communications, Inc., New York City, of counsel), for petitioner ITT World Communications Inc.
 H. Richard Schumacher, New York City (Frank W. Krogh, Cahill, Gordon & Reindel, Francis J. DeRosa, Charles M. Lehrhaupt, RCA Global Communications, Inc., New York City, of counsel), for petitioner RCA Global Communications, Inc.
 Alvin K. Hellerstein, New York City (Henry J. Silberberg, Shira A. Scheindlin, Stroock & Stroock & Lavan, Robert E. Conn, Robert Michelson, Western Union International, Inc., New York City, of counsel), for petitioner Western Union International, Inc.
 John E. Ingle, Washington, D. C. (Werner K. Hartenberger, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, FCC, Donald I. Baker, Asst. Atty. Gen., Robert B. Nicholson and Joen Grant, Attys., Dept. of Justice, Washington, D. C., of counsel), for respondent FCC.
 Alfred G. Walton, New York City (Randall B. Lowe, Edgar Mayfield, New York City, of counsel), for intervenor AT&T.
 Thomas J. O'Reilly, Washington, D. C. (Chadbourne, Parke, Whiteside & Wolff, Washington, D. C., of counsel), for intervenor Hawaiian Telephone Co.
 Charles M. Meehan, Washington, D. C. (Joseph E. Keller, Wayne V. Black, Larry S. Solomon, Keller & Heckman, Washington, D. C., of counsel), for intervenor American Petroleum Institute.
 Before KAUFMAN, Chief Judge, OAKES, Circuit Judge, and BRYAN,* District Judge.
 OAKES, Circuit Judge:
 
 
 1
 A petition to review an order of the Federal Communications Commission (FCC) has been filed, pursuant to 28 U.S.C. § 2344, by each of the three major international record communications[1] common carriers (IRCs), ITT World Communications Inc., RCA Global Communications, Inc., and Western Union International, Inc. As a matter of policy to govern future applications for licenses, the Commission ruled that a public need exists for international "dataphone-type" service[2] and that applications to provide such service may be submitted under Section 214 of the Communications Act of 1934, 47 U.S.C. § 214, by American Telephone & Telegraph Co. (AT&T) and by petitioners here, who at the same time may submit applications to interconnect their facilities with AT&T's regular telephone lines.[3] The order neither granted nor denied any applications, but merely directed the Commission's "Chief, Common Carrier Bureau," to accept applications from AT&T and the IRCs.[4] In re Inquiry Into Policy to be Followed in Future Authorization of Overseas Dataphone Service, 57 F.C.C.2d 705 (1976). We deny the petitions to review.
 
 
 2
 In June, 1971, the FCC was asked to remove the restrictions barring data and facsimile transmissions from the overseas telephone networks. See note 3 supra. After petitioners and AT&T made preliminary comments, the Commission issued a "Notice of Inquiry into Policy to be Followed in Future Authorization of Overseas Dataphone Service," 36 F.C.C.2d 605 (1972), which indicated that the Commission would set an overall policy rather than proceed on a case-by-case basis as applications were received from each carrier, id. at 608. In the comments that followed, nearly all concerned agreed that there was an unsatisfied demand for international dataphone service.[5] The telephone and equipment industry parties, led by AT&T, advocated a policy authorizing both voice and record carriers, see note 1 supra, to offer the service, but the IRCs argued for exclusion of AT&T because its entry would extend the AT&T monopoly and threaten the economic vitality of the IRCs.
 
 
 3
 The Commission, after the manner of agencies in today's world, finally announced its decision in January, 1976, after a time lapse that we do not condone. The decision recognized that removal of the restriction against AT&T could hurt the IRCs[6] but stated that a market existed for the proposed overseas dataphone services, 57 F.C.C.2d at 706-07. The Commission found it to be in the public interest to remove the restriction on AT&T's ability to apply to use its overseas facilities for data-phone services and "for the IRCs to expand their . . . services . . . and to interconnect their facilities with AT&T's domestic (telephone) network for this purpose." Id. at 709. It described the IRCs' services as "different" from those to be offered by AT&T, meaning that there would not be "competition for the sake of competition." Id. The FCC reserved the question of what form interconnection should take, pending applications, and stated that it would later issue "any appropriate orders, including any necessary conditions to (current) certificates of convenience and necessity." Id. at 711.[7]
 
 
 4
 The principal arguments made by the IRCs in their petitions here are that the Commission's decision was arbitrary and capricious, in that it failed to consider that the IRCs were offering a service fully equivalent to AT&T's, and that the FCC abandoned prior precedent without adequate explanation. The IRCs' arguments, however, are beside the point. The only issue before this court is whether the Commission erred in allowing AT&T to submit an application to enter the overseas dataphone service market. As the Commission points out in its brief to this court, it has neither granted nor denied applications, and it has not resolved the apparently difficult question of the method of interconnection between the IRCs and AT&T. The order in issue does not determine whether public convenience and necessity require that AT&T be permitted to supply overseas dataphone service over its existing circuits; it determines only that as a matter of policy AT&T will not be precluded from applying to do so.
 
 
 5
 Our only concern here, then, is whether the order was arbitrary and capricious insofar as it did not exclude AT&T from applying to offer overseas dataphone service. We answer that question in the negative. The finding of need for the service is not challenged, nor is the finding that AT&T can satisfy part of that need at low cost with existing facilities. We need not concern ourselves at this stage with competitive considerations, since the arguments based on such concerns against the grant of AT&T's Section 214 application may be made in the proceeding thereon. Most of the other issues raised by petitioners similarly are not here ripe for review, since they are factual in nature and since further administrative proceedings are contemplated at which evidence on these issues may be presented. Compare Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). See generally K. Davis, Administrative Law Treatise § 21.10 (1958).
 
 
 6
 With regard to the IRCs' precedent argument, the Commission was not bound to prohibit AT&T from applying to offer dataphone communications internationally by its 1964 decision in the so-called TAT-4 case. In that case, called "TAT-4" because it concerned a then-proposed fourth trans-Atlantic telephone cable from the East Coast to Europe, the Commission denied to AT&T the authority to provide international leased private line alternate voice/data service, reserving that to the IRCs on the ground that "AT&T, with its huge resources," would by entry into this service "seriously jeopardize the ability of the (IRCs) to obtain a meaningful share of the business." In re American Tel. & Tel. Co., 37 F.C.C. 1151, 1159 (1964). The order below expressly stated that it was "in no way (to) be construed as reversing (the TAT-4) policy" or to "be interpreted so as to authorize AT&T to offer any other new services now or in the future." 57 F.C.C.2d at 709. Only if AT&T is given final approval to enter the overseas dataphone market after a Section 214 proceeding will the TAT-4 policy perhaps be changed. The rationale for the change can be examined only at that time.
 
 
 7
 Because we cannot say that the statement of policy at issue here, which decides only that AT&T may submit an application to enter the overseas dataphone market, is arbitrary or capricious, the petitions for review are denied.
 
 
 
 *
 Hon. Frederick vanPelt Bryan of the Southern District of New York, sitting by designation
 
 
 [1]
 Record communications consist of the transmission and reception of data or other hard copy by electro-mechanical devises. By contrast, voice communications are transmitted by electrical-acoustical means, such as the common telephone. Data transmission requires specially selected circuits or equipment to avoid errors and distortions that can be detected and compensated for by the human brain and ear but not by mechanical receivers
 
 
 [2]
 With "dataphone-type" service, data, facsimile or other hard copy communications may be sent by telephone circuits at regular message rates, using such attachments as facsimile scanners and teletypewriters. A customer wishing to use this service must establish a phone line to the recipient by placing a toll call through a switching system; thus this is called a "switched message" service. A "switched" service is to be distinguished from a "private line" service, in which the customer leases a permanent channel or circuit between two or more points, see 47 C.F.R. § 43.61(a)(6) (1976). Domestic "dataphone" service has been provided for many years
 
 
 [3]
 Since 1972 IRC customers have been able to transmit data over AT&T's message telephone service lines to IRC Message Centers in the so-called "gateway" cities (consisting of New York, Washington, San Francisco, Miami and New Orleans), but the IRCs must then use their own circuits to transmit data or "record" communications to the intended recipients overseas
 
 
 [4]
 The Commission has delegated substantial responsibility for the issuance of certificates of convenience and necessity under 47 U.S.C. § 214 to its Common Carrier Bureau and that Bureau's Chief. See 47 C.F.R. §§ 0.91(h), Q.291 (1976)
 
 
 [5]
 While "Dataphone" is an AT&T tradename, the FCC used the term "dataphone" to refer to all "dataphone-type" service. We adopt the Commission's convention here
 
 
 [6]
 We realize that much of the IRCs' concern stems not from any immediate threat but from the long-range possibility that dataphone-type services may ultimately prove more flexible and cost-effective than Telex or AVD for the majority of users of international data services. Although the record does not support such a conclusion, this might be a potential threat to the viability of the IRCs if it should occur. However, our statutory mandate is to regulate telecommunications such that the public receives high quality service at the lowest cost. If the IRCs cannot effectively compete with dataphone-type users of MTS, consistent with this Order, and if the service thereby fulfills a public need at cost-justified rates below those which the IRCs can justify for their own service, we shall not impose a protective umbrella to assure the IRCs a portion of the market
 
 
 [57]
 F.C.C.2d at 710
 
 
 [7]
 Applications have been filed by AT&T under Section 214 for modification of its current certificates. This is objected to by the IRCs, and the latter have filed petitions for interconnection, replied to by AT&T. None of these have been acted on by the FCC, and they are not before us. Whether in the light of their interrelationship the applications of AT&T and of the IRCs should be consolidated is also a matter for resolution in the first instance by the Commission